# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | | |
|---|---|---|
| JOY A. CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:07-cv-00606-JEO |
| | ) | |
| SANOFI-AVENTIS U.S. LLC; | ) | |
| PHARMACEUTICAL PRODUCT | ) | |
| DEVELOPMENT, INC; and MARIA | ) | |
| ANNE KIRKMAN CAMPBELL, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the court upon the plaintiff's motion to remand this case back to the Circuit Court of Etowah County, Alabama.  (Doc. 7).[1]  Upon consideration, the court finds that the plaintiff's motion is due to be denied.

### BACKGROUND

#### Factual History

As far as the court can discern, the plaintiff, Joy A. Campbell (hereinafter "the plaintiff"), is an adult resident of Gulf Port, Mississippi.  (Doc. 1, Ex. 1 at ¶ 4).[2]  Defendant Sanofi-Aventis U.S. LLC (hereinafter "Sanofi") is a Delaware corporation with its principal place of business in New Jersey.  (Doc. 1, Ex. 1 at ¶ 5; Doc. 5 at ¶ 5).  Pharmaceutical Product Development, Inc. (hereinafter "PPD"), is a Texas corporation with its principal place of business in North Carolina.  (Doc. 1, Ex. 1 at ¶ 7).  Prior to her incarceration in Kentucky, Maria Anne Kirkman-Campbell,

---

[1] References herein to "Doc.___" are to the document number assigned by the Clerk of the Court.

[2] References herein to "Ex.___" are to the exhibit numbers associated with a particular document.

M.D. (hereinafter "defendant Campbell"), practiced medicine in Gadsden, Alabama. *Id*. at ¶ 6.

At all times relevant to the plaintiff's complaint, Sanofi was in the business of promoting,

marketing, supplying, testing, selling, and/or distributing the prescription pharmaceutical

telithromycin, also known as Ketek®, in several states throughout the U.S.  (Doc. 5 at ¶ 5).

Sanofi controls the design, assembly, packaging, marketing, advertising, manufacturing, labeling,

testing, promoting, and/or sale of Ketek®.  *Id*. at ¶ 9.  Ketek® was an antibiotic drug designed to

treat various infections of the respiratory system.  (Doc. 1, Ex. 1 at ¶ 12; Doc. 5 at ¶ 12).

     In response to concerns of the FDA regarding adverse side effects of Ketek®, including

liver toxicity, Sanofi initiated a study of Ketek® (hereinafter "Study 3014").  (Doc. 1, Ex. 1 at ¶

17).  Study 3014 was designed to test the safety and efficacy of Ketek® in patients diagnosed

with acute sinusitis, acute exacerbation of chronic bronchitis, and pneumonia. *Id*. at ¶ 21.  In

November 2001, Sanofi contracted with PPD to assist in the completion of Study 3014.  *Id*. at ¶

19).

     On November 5, 2001, defendant Campbell contracted with Sanofi, through PPD, to be

an independent clinical trial investigator for Study 3014.  (Doc. 1, Ex. 1 at ¶ 21; Doc. 15, Ex. 1 at

¶ 5).  Under the contract with PPD, defendant Campbell was obligated to recruit patients

suffering from acute sinusitis, acute exacerbation of chronic bronchitis and pneumonia,

administer Ketek® or a comparable drug to each patient, monitor the patients for adverse side

effects, and then draft a report on each patient participant to be submitted to PPD.  (Doc. 1, Ex. 1

at ¶ 22-25).  PPD was to submit the reports to the manufacturer, who in turn was to submit the

reports to the FDA for use in its evaluation of Ketek's® safety as it related to liver toxicity.

(Doc. 1, Ex. 1 at ¶ 25).  The reports were supposed to confirm the requisite visits, the medication

taken, and any adverse effects experienced by the patient participants while taking the assigned

medication. (Doc. 1, Ex. 1 at ¶ 25). Defendant Campbell's clinical site was only one of 1800

clinical sites at which Study 3014 was conducted. (Doc. 15, Ex. 1 at ¶ 5). Approximately 24,000

patients were involved in the Study.

From November 2001 through March 2002, defendant Campbell reported to PPD and

Sanofi that she had enrolled 407 patients to participate in Study 3014, and that all the patients

had completed the study. (Doc. 1, Ex. 1 at ¶ 26). In April 2002, defendant Campbell produced a

report to PPD and Sanofi for each patient she claimed to have enrolled. (Doc. 1, Ex. 1 at ¶¶ 26,

32). PPD and Sanofi submitted the reports to the FDA. (Doc. 1, Ex. 1 at ¶ 29).

On March 24, 2004, defendant Campbell pled guilty to one count of mail fraud pursuant

to 18 U.S.C. § 1341 for fraudulent conduct during her clinical trial investigation of Ketek® in

Study 3014. *See United States of America v. Maria "Anne" Kirkman Campbell, aka Anne*

*Kirkman Campbell*, 4:03-cr-00437-LSC-HGD (docket entry for October 23, 2003 (N.D. Ala.)).

The indictment charged as follows:

> 2. From on or about September 2001, until on or about September 2002,
> in Etowah County, within the Northern District of Alabama, the defendant Maria
> "Anne" Kirkman Campbell[,] also known as Anne Kirkman Campbell[,] devised
> a scheme and artifice to defraud Aventis and PPD, and to obtain money and
> property from Aventis and PPD by means of false and fraudulent pretenses and
> representations, by submitting false documentation to Aventis, PPD and FDA
> concerning the clinical study to evaluate the safety and effectiveness of Ketek[®].
>
> 3. It was a part of the scheme and artifice to defraud and for obtaining
> money and property that the defendant would and did the following:
>
>> a.  Enroll and cause to be enrolled persons as study
>> subjects who did not qualify under the study protocol.
>>
>> b.  Enroll and cause to be enrolled a non-existent person.

c.  Create and cause to be created documentation falsely reflecting that study subjects had been informed concerning participation in the study.

d. Create and cause to be created documentation falsely reflecting that study subjects had consented to participate in the study.

e. Create and cause to be created documentation falsely reflecting that study subjects had actually been examined and diagnosed with a qualifying disease.

f. Create and cause to be created documentation falsely reflecting that study subjects had blood drawn for laboratory analysis for the study trial.

g. Create and cause to be created documentation falsely reflecting that blood samples submitted for laboratory analysis were actually drawn from the identified study subjects on dates stated.

h. Substitute for laboratory analysis, blood drawn from another person for that of a study subject.

I. Create and cause to be created documentation falsely stating that study subjects returned for Visit 2, provided information concerning the study drug, and had additional blood drawn for laboratory analysis.

j. Create and cause to be created documentation falsely stating that study subjects had provided information for Visit 3 concerning the study drug.

k. Create and cause to be created documentation falsely stating that study subjects had completed the clinical study trial.

*United States of America v. Maria "Anne" Kirkman Campbell, aka Anne Kirkman Campbell*, CR-03-CO-0437-LSC-HGD, doc. l at pp. 7-8.  She was sentenced on March 24, 2004, to 57 months custody, three years supervised release, a fine of $557,251.22, and restitution in the amount of $925,774.61.  *Id*. at Doc. 46.

4

Ketek® received FDA approval on April 1, 2004.  (Doc. 5 at ¶ 15).  The parties dispute whether the FDA considered any of defendant Campbell's tainted clinical trial reports in the process of Study 3014, whether Study 3014 was tainted by Campbell's fraud, and whether the FDA relied on Study 3014 in its decision to approve Ketek®.  (Doc. 15 at 5, 12-15; Doc. 16 at 5).  The plaintiff was prescribed and ingested Ketek® in March 2006 and suffered a liver injury.  (Doc. 1, Ex. 1 at ¶ 37).

## Procedural History

On February 12, 2007, the plaintiff filed a complaint in the Circuit Court of Etowah County, Alabama.  (Doc. 1, Ex. 1).  The plaintiff made the following claims against defendants Sanofi, PPD, and Campbell for creating, testing, marketing, and selling Ketek®: (1) Alabama Extended Manufacturer's Liability Doctrine (hereinafter "AEMLD"); (2) strict product liability (failure to warn); (3) negligence; (4) breach of implied warranty of merchantability; (5) fraud and misrepresentation; and (6) wantonness.  (Doc. 1, Ex. 1).

On April 4, 2007, Sanofi and PPD filed a notice of removal.  (Doc. 1).  The following day, PPD filed an answer to the complaint.  (Doc. 2).  On April 10, 2007, Sanofi filed an answer to the complaint.  (Doc. 5).  On May 3, 2007, the plaintiff filed a motion to remand this case back to the Circuit Court of Etowah County, Alabama.  (Doc. 7).  On the same day, the plaintiff filed a memorandum of law in support of her motion.  (Doc. 8).  The plaintiff filed a notice of supplemental authority in support of her motion on May 21, 2007.  (Doc. 11).  The plaintiff filed an additional notice of supplemental authority on May 22, 2007.  (Doc. 12).  Sanofi and PPD filed a brief in opposition to the plaintiff's motion on June 5, 2007.  (Doc. 15).  The plaintiff filed a surreply brief to the defendants' opposition to remand on June 12, 2007.  (Doc. 16).

## ARGUMENTS OF THE PARTIES

### Plaintiff's Argument in Support of Remand

The plaintiff argues that this case should be remanded to the Circuit Court of Etowah County, Alabama, because diversity jurisdiction does not exist.  (Doc. 8 at p. 2).  First, she argues that defendant Campbell is a legal resident of Etowah County, Alabama, because her incarceration in Kentucky does not change her domicile in Alabama.  (Doc. 8 at pp. 3-4). Second, the plaintiff argues that defendants Sanofi and PPD have not met their burden of proving fraudulent joinder because the defendants have failed to show that the facts alleged by the plaintiff have no possibility of stating a valid cause of action against defendant Campbell.  (Doc. 8 at pp. 4-12).

### Defendants' Arguments in Opposition to Remand

The defendants argue that this case should not be remanded to the Circuit Court of Etowah County, Alabama, because complete diversity of citizenship exists between the plaintiff and all the properly joined defendants.  (Doc. 1 at pp. 2-3).  First, the defendants argue that defendant Campbell is not a resident of Alabama, because Campbell currently resides in a federal penitentiary outside of Alabama.  (Doc. 1 at ¶ 10).  Second, the defendants argue that the plaintiff fraudulently joined defendant Campbell, because there is no possibility the plaintiff can establish any cause of action against her under either the law or facts alleged.  (Doc. 1 at ¶ 12).

### STANDARD ON A MOTION TO REMAND

The Court of Appeals for the Eleventh Circuit has articulated the relevant standard to be applied on a motion to remand when diversity of citizenship is in question:

> When a defendant removes a case to federal court on diversity grounds, a

court must remand the matter back to state court if any of the properly joined parties in interest are citizens of the state in which the suit was filed.  *See Lincoln Prop. Co. v. Roche*, --- U.S. ----, 126 S. Ct. 606, 613, 163 L. Ed. 2d 415 (2005) (citing 28 U.S.C. § 1441(b)).  Such a remand is the necessary corollary of a federal district court's diversity jurisdiction, which requires complete diversity of citizenship.

When a plaintiff names a non-diverse defendant solely in order to defeat federal diversity jurisdiction, the district court must ignore the presence of the non-diverse defendant and deny any motion to remand the matter back to state court.  The plaintiff is said to have effectuated a "fraudulent joinder," *see Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997), and a federal court may appropriately assert its removal diversity jurisdiction over the case.

*Henderson v. Washington Nat. Ins. Co.*, 454 F.3d 1278, 1281 (11th Cir. 2006).  Additionally, the

court has clearly established standards when fraudulent joinder is alleged:

A defendant seeking to prove that a co-defendant was fraudulently joined must demonstrate either that: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court.  The defendant must make such a showing by clear and convincing evidence.

*Henderson*, 454 F.3d at 1281 (internal citations omitted).  United States District Judge Virginia

Hopkins also recently stated:

"In evaluating a motion to remand, the removing party bears the burden of demonstrating federal jurisdiction." *Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1373 (11th Cir. 1998).  "The determination of whether a resident defendant has been fraudulently joined must be based upon the plaintiff's pleadings at the time of removal, supplemented by the parties." *Id*. at 1380.  "While the proceeding appropriate for resolving a claim of fraudulent joinder is similar to that used for ruling on a motion for summary judgment under Fed. R. Civ. P. 56(b) . . . the jurisdictional inquiry must not subsume substantive determination." *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997) (internal citations and marks omitted).  A district court must resolve all questions of fact in favor of the plaintiff; however, there must be some dispute of fact before the court can resolve that fact in the plaintiff's favor. *Legg v. Wyeth*, 428 F.3d 1317, 1323 (11th Cir. 2005).  When a defendant's affidavits are not disputed by the plaintiff, the court "cannot then resolve the facts in the [plaintiff's] favor based solely on the unsupported allegations in the Plaintiff's complaint." *Id*.

7

> A federal court must be certain of its jurisdiction before "embarking upon a safari in search of a judgment on the merits." *Crowe*, 113 F.3d at 1538.  A "district court's authority to look into the ultimate merits of the plaintiff's claims must be limited to checking for obviously fraudulent or frivolous claims." *Crowe*, 113 F.3d at 1542.

*Southern v. Pfizer, Inc.*, 471 F. Supp. 2d 1207, 1214 (N.D. Ala. 2006).  "A possibility of success as to *any* of the [the plaintiff's] claims will lead to a determination that [the resident defendant] is not fraudulently joined in this action, that complete diversity does not exist among the parties, and that this action is due to be remanded." *Id*. at 1215 (italics added).

## DISCUSSION

### Citizenship of Defendant Campbell

The plaintiff argues that defendant Campbell is a legal resident and citizen of Etowah County, Alabama.  (Doc. 8 at pp. 3-4).  The plaintiff cites *Ex parte Sides*, 594 So. 2d 93 (Ala. 1992) for the proposition that once a party's "domicile is acquired, it is presumed to exist until a new one has been acquired, and the involuntary confinement of [that party] in a prison will not effect a change in domicile." *Id*. at 95.  That case, however, dealt with the issue of venue, not jurisdiction.

The Court of Appeals for the Tenth Circuit articulated the standard to be applied in determining a prisoner's citizenship in the diversity jurisdiction context:

> For purposes of federal diversity jurisdiction, an individual's state citizenship is equivalent to domicile.  *Crowley v. Glaze*, 710 F.2d 676, 678 (10th Cir. 1983).  To establish domicile in a particular state, a person must be physically present in the state and intend to remain there.  *Keys Youth Servs., Inc. v. Olathe*, 248 F.3d 1267, 1272 (10th Cir. 2001).  Once domicile is established, however, the person may depart without necessarily changing his domicile.  "To effect a change in domicile, two things are indispensable: First, residence in a new domicile, and second, the intention to remain there indefinitely."  *Crowley*, 710 F.2d at 678.  Because domicile is a voluntary status, a prisoner is presumed to be a citizen of

the state of which he was a citizen before his incarceration, even if he is subsequently incarcerated in another state. *Sullivan v. Freeman*, 944 F.2d 334, 337 (7th Cir. 1991). . . .  The presumption, however, is rebuttable.

*Smith v. Cummings*, 445 F.3d 1254, 1259-60 (10th Cir. 2006).

There is no dispute that defendant Campbell was physically present in Alabama prior to her incarceration.  Neither Sanofi nor PPD has offered any evidence that Campbell did not intend to remain in Alabama prior to her incarceration.  While Campbell may currently be located in Kentucky, neither Sanofi nor PPD has offered any evidence that she intends to remain in Kentucky indefinitely.  Therefore, even though she is incarcerated in Kentucky, Campbell is presumed to be a citizen of Alabama because she was a citizen of Alabama prior to her incarceration and the defendants have offered no evidence to rebut this presumption.

**Fraudulent Joinder Assertion**

Sanofi and PPD next argue that the plaintiff fraudulently joined defendant Campbell in this lawsuit because the plaintiff cannot possibly prove a cause of action against her.  (Doc. 15 at 7-18).  The plaintiff disagrees and asserts that she can state a claim on the negligence and fraud claims.[3]

**Count One: Plaintiff's AEMLD Claim**

Sanofi and PPD argue that the plaintiff cannot possibly establish a cause of action against Campbell pursuant under the AEMLD.  (Doc. 15 at 8-9).  In Alabama, an AEMLD claim is established by satisfaction of the following standard:

The AEMLD establishes a cause of action against "a manufacturer, or

---

[3]In her memorandum in support of the motion to remand, the plaintiff premises her motion on the fact that she can make out a claim for negligence and fraud.  She did not premise her motion on the remaining claims.  However, for completeness, the court will address each claim.

supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, [thereby] constitut[ing] negligence as a matter of law." *Casrell v. Altec Industries, Inc.*, 335 So. 2d 128, 132 (Ala. 1976). In order to establish liability under the AEMLD, [the plaintiff] must prove: [She] suffered injury or damages to [herself] or [her] property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if (a) the seller was engaged in the business of selling such a product, and (b) it was expected to, and did, reach the user or consumer without substantial change in the condition in which it was sold. *Key v. Maytag Corp.*, 671 So. 2d 96, 101 (Ala. Civ. App. 1995); *quoting Atkins v. American Motors Corp.*, 335 So. 2d 134 (Ala. 1976).

*Southern*, 471 F. Supp. 2d at 1215.

In order to establish a claim under AEMLD against defendant Campbell, the plaintiff would have to first demonstrate that Campbell was a "manufacturer, or supplier, or seller," of Ketek®. In addition, the plaintiff would have to demonstrate that Campbell sold Ketek®. The plaintiff has alleged no such facts. Insofar as the complaint alleges that all the defendants acted in concert to manufacture, supply, and sell Ketek®, the plaintiff has failed to allege any facts sufficient to support liability on the part of Campbell. The plaintiff did not allege that Campbell entered into any contractual or business relationship with the other defendants for the purpose of manufacturing, supplying, or selling Ketek®. To the contrary, the plaintiff concedes that Campbell's relationship to the other defendants was limited to a contractual obligation to test Ketek® and report the results of those tests to the other defendants. (Doc. 1, Ex. 1 at ¶¶ 20-34). Without any allegation that Campbell manufactured, supplied, or sold Ketek®, the court finds that there is no possibility that the plaintiff can establish a cause of action under AEMLD against her.

### Count Two: Strict Product Liability/Failure to Warn Claim

Sanofi and PPD argue that the plaintiff cannot possibly establish a cause of action for

strict product liability/failure to warn against defendant Campbell.  (Doc. 1 at ¶¶ 17-19; Doc. 15

at 8-9).

> In cases involving complex products, such as those in which
> pharmaceutical companies are selling prescription drugs, the learned intermediary
> doctrine applies.  Under the learned intermediary doctrine, a manufacturer's duty
> to warn is limited to an obligation to advise the prescribing physician of any
> potential dangers that may result from the use of its product.  *This standard is* '*an*
> *understandable exception to the Restatement's general rule that one who markets*
> *goods must warn foreseeable ultimate users of dangers inherent in his products.*'
> As such, we rely on the expertise of the physician intermediary to bridge the gap
> in special cases where the product and related warning are sufficiently complex so
> as not to be fully appreciated by the consumer. . . .  Under the "learned
> intermediary doctrine" the adequacy of [the defendant's] warning is measured by
> its effect on the physician, . . . to whom it owed a duty to warn, and not by its
> effect on [the consumer].

*Walls v. Alpharma USPD, Inc.*, 887 So. 2d 881, 883 (Ala. 2004) (internal citation omitted)

(emphasis supplied).  In order to establish a cause of action for strict product liability/failure to

warn against Campbell, the plaintiff would first have to first demonstrate that Campbell was a

manufacturer of Ketek®.  For the same reason that the plaintiff cannot possibly establish a cause

of action against Campbell under AEMLD, the plaintiff cannot possibly establish a cause of

action for strict product liability/failure to warn against Campbell.  That is, the plaintiff has failed

to allege that Campbell was a manufacturer of Ketek®.  Absent any fiduciary, contractual,

physician/patient, or other existing relationship between the plaintiff and Campbell, any duty to

warn about Ketek's® toxicity or tendency to cause liver injury was incumbent upon Sanofi as the

manufacturer of the drug.  Again, however, the plaintiff concedes that Campbell's relationship to

the other defendants was limited to a contractual obligation to test Ketek® and report the results

of those tests to the other defendants.  (Doc. 1, Ex. 1 at ¶¶ 20-34).  Without any allegation that

Campbell manufactured Ketek®, the court finds that there is no possibility that the plaintiff can

establish a cause of action for strict product liability/failure to warn against her.

## Count Three: Negligence

Sanofi and PPD next argue that the plaintiff cannot possibly establish a cause of action

against Dr. Campbell for negligence.  (Doc. 15 at 9-15).  In Alabama, negligence is established

by satisfaction of the following standard:

> "To establish negligence, a plaintiff must prove: (1) a duty to a foreseeable
> plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or
> injury."  *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994); *Albert v. Hsu*, 602
> So. 2d 895, 897 (Ala. 1992).  Negligence is a mixed question of law and fact.
> Whether the defendant in a negligence action owed the claimant a duty is strictly a
> question of law.  *RaCON, Inc. v. Tuscaloosa County*, [Ms. 1031512, July 28,
> 2006] --- So. 2d ---- (Ala. 2006).  If the trial court determines that the defendant
> owed the plaintiff a duty, then the questions of breach of that duty, proximate
> causation, and damages are normally resolved by the jury.

*Jones Food Co., Inc. v. Shipman*, 1051322, 2006 WL 3718254, *5 (Ala. December 15, 2006).

While "a legal duty to exercise care . . . arises where the parties are bound by contract [ ] or

where the obligations are expressly or impliedly imposed by statute, municipal ordinance, or by

administrative rules or regulations, or by judicial decisions," *Gowens v. Tys. S. ex rel. Davis*, 948

So. 2d 513, 527 (Ala. 2006) (internal citations omitted), a legal duty may also arise under certain

other circumstances as well.

"In determining whether a duty exists, the courts consider factors including public policy;

social considerations; foreseeability; the nature of the defendant's activity; the relationship

between the parties; and the type of possible injury or harm."  *Akpan v. Farmers Ins. Exchange,

Inc.*, 2050420, 2007 WL 80497, *7 (Ala. Civ. App. January 12, 2007) (internal citation omitted).[4]

---

[4]In *Akpan*, the court faced a question of first impression in Alabama as to "[w]hether an independent adjustor or investigator with whom an insurance company contracts for the investigation and adjustment of a claim owes a duty to the insured."  The court determined that they did not.  *Id.*, 2007 WL 3718254 at *8.

In addition, the Alabama Supreme Court has explicitly recognized the possibility of a duty of care owing to foreseeable third parties: "In a variety of circumstances, this Court has recognized a duty to foreseeable third parties, based on a general 'obligation imposed in tort to act reasonably.'" *Taylor v. Smith*, 892 So. 2d 887, 893 (Ala. 2004) (citing *Berkel & Co. Contractors, Inc. v. Providence Hosp.*, 454 So. 2d 496, 502 (Ala. 1984)). "Foreseeability does not require that the particular consequence should have been anticipated, but rather that some general harm or consequence could have been anticipated." *R.B.Z. v. Warwick Development Co.*, 681 So. 2d 566, 568-69 (Ala. Civ. App. 1996) (citing *Thetford v. City of Clanton*, 605 So. 2d 835, 840 (Ala. 1992).

The defendants argue that no such duty exists.  They rely in part on the decision in *Staples v. Merck*, 270 F. Supp. 2d 833 (N.D. Tx. 2003).  The plaintiff counters that *Staples* is factually distinguishable.

In *Staples*, the plaintiffs alleged that they suffered adverse cardiovascular effects as a result of ingesting VIOXX®, an osteoarthritis and pain-relief drug that had been approved for sale by the FDA.  Specifically, they asserted that Merck, through its clinical studies, knew that VIOXX® caused adverse cardiovascular effects.  *Id*. at 835.  They also alleged that, instead of disclosing this information, Merck negligently and fraudulently concealed it, marketing the drug as safe and effective.  *Id*.  They further alleged that the clinical researchers involved in the testing acted in concert with Merck, choosing not to report the drug's adverse effects that were discovered during the development stage of VIOXX®.  *Id*.  The defendants removed the case to federal court claiming that the non-diverse clinical researchers were fraudulently joined.  The plaintiffs filed a motion to remand.  Rejecting the motion, the court stated that the clinical

researchers owed the plaintiffs no duty of reasonable care because, "[i]n Texas, generally,
independent laboratories have no duty of reasonable care toward parties with which they did not
contract.[ ]"  *Id.* at 838 (footnote omitted).  The court further stated:

> In *SmithKline Beecham Corp. v. Doe*, [903 S.W.2d 347 (Tex. 1995),]
> defendant SmithKline, an independent laboratory under contract with plaintiff's
> prospective employer, The Quaker Oats Company ("Quaker"), performed a drug
> test on plaintiff.  SmithKline Beecham Corp. ("SmithKline") did not warn
> plaintiff that there were ways to register a "false positive" (i.e. eating poppy seed
> muffins) and, when plaintiff's test registered such a result, she sued SmithKline
> for failing to warn her of that possibility.  The Supreme Court of Texas refused to
> impose such a duty upon SmithKline, stating that "the duty that Doe seeks would
> charge SmithKline with responsibility that belongs to its clients," and that
> "SmithKline should be allowed to perform only the service it chose to offer and
> Quaker chose to procure." [ ]  The Court also stated that SmithKline could not be
> said to have negligently "created" the situation by not warning plaintiff because it
> did not create or control the use of its test results, but merely reported the results
> back to the employer. [ ]

> The Fifth Circuit followed *SmithKline Beecham Corp*. in *Willis v. Roche
> Biomedical Labs, Inc*.  In *Willis*, the employer contracted defendant Roche
> Biomedical Laboratories ("Roche") to conduct "the screening and testing of urine
> samples provided by [employer] in accordance with strict protocol procedures in
> the contract." [ ]  Plaintiff brought a negligence action against Roche when his
> drug test registered a "false positive." [ ]  The Fifth Circuit, in holding that Roche
> did not owe the plaintiff a duty of reasonable care, focused on the relationship
> between Roche and the plaintiff, independent of either party's connection with the
> employer. [ ]  Because the parties had no real relationship other than their mutual
> connection to the employer, the Fifth Circuit ruled in favor of Roche. [ ]  While
> the facts in *SmithKline Beecham Corp*. and *Willis* are not entirely analogous to
> this case, those cases stand for the general proposition that an independent
> laboratory's duties do not go beyond those it contracted to perform.

> The Clinical Researchers' relationship to the Plaintiffs is even more
> attenuated than the relationships in *SmithKline Beecham Corp*. and *Willis*.  In
> those cases, the defendants performed the tests on the plaintiffs. [ ]  The Plaintiffs
> in this case were not among the subjects the Clinical Researchers tested.  The
> Clinical Researchers did not even know the Plaintiffs existed prior to this
> litigation.  Thus, it follows that Texas negligence law would not impose a duty on
> the Clinical Researchers to the Plaintiffs, persons with whom they had no contact
> whatsoever.  Because Merck, and not the Clinical Researchers, "created and

14

controlled the use of the data," any duty to know that VIOXX® presented health
risks to those who ingested it resides with Merck, not the Clinical Researchers. [ ]

*Id*. at 838-39.

Despite the fact that *Staples* is factually distinguishable from the present case, the

undersigned finds that to impose a duty on clinical researchers including defendant Campbell to

third parties such as the plaintiff when Campbell had no role in the design, manufacture, sale, or

promotion of the product would be unreasonable.  She had no control of the application and

approval process for the drug.  She did not have a doctor-patient relationship with the plaintiff

that would justify imposition of a legal duty.  In fact, she had no relationship with the plaintiff

other than through her contract with PPD and Sanofi.  Although the court is greatly troubled by

Campbell's conduct, it was addressed by the criminal prosecution that resulted in her

incarceration.  The court cannot impose a duty on Campbell in this case based solely upon her

role as a researcher under contract with the other defendants.  The plaintiff has not demonstrated

any relationship between herself and Campbell that would support imposition of a duty of care to

the plaintiff.  Further, their relationship is too attenuated because of the role of PPD and Sanofi.[5]

As a clinical researcher under contract with PPD, Campbell's obligation is determined by her

contractual relationship with the other defendants.  Additionally, the plaintiff is not a party to the

contract between Campbell and the other defendants.  Accordingly, the court finds that the

plaintiff has not demonstrated the requisite "possibility of success" on her negligence claim to

support a determination that Campbell is not fraudulently joined.  *Southern*, 471 F. Supp. 2d at

---

[5]In resolving the question of whether a duty existed, the court finds that the FDA's reliance or non-reliance on Study
3014 is not relevant.

1215.[6]

## Count Four: Breach of Implied Warranty of Merchantability

Sanofi and PPD argue that the plaintiff cannot possibly establish a cause of action against Campbell for breach of implied warranty of merchantability.  (Doc. 15 at 8-9).  The Code of Alabama states in part that "[u]nless excluded or modified, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  ALA. CODE § 7-2-314(1).  A "[m]erchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices of goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.  ALA. CODE § 7-2-104(1).  The Code further defines "[g]oods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action."  ALA. CODE § 7-2-105(1).  "Contract for sale" means "a present sale of goods and a contract to sell goods at a future time.  A 'sale' consists in the passing of title from the seller to the buyer for a price (Section 7-2-401).  A 'present sale' means a sale which is accomplished by the making of the contract."  ALA. CODE § 7-2-106(1).

Sanofi and PPD are correct that the plaintiff cannot possibly establish a cause of action for breach of implied warranty of merchantability against Campbell for a number of reasons.

---

[6]In view of the court's finding on the duty issue, further discussion of the causation issue raised by the defendants is pretermitted.

First, there was no contract for sale between the plaintiff and Campbell because there was no

"passing of title from [Campbell] to the [plaintiff] for a price." ALA. CODE § 7-2-106(1).

Second, Campbell is not "a merchant with respect to" antibiotics used to treat infections of the

respiratory system, because Campbell is not "a person who deals in goods of the kind or

otherwise by [her] occupation holds [herself] out as having knowledge or skill peculiar to the

practices of goods involved in the transaction or to whom such knowledge or skill may be

attributed by [her] employment of an agent or broker or other intermediary who by his

occupation holds himself out as having such knowledge or skill." ALA. CODE § 7-2-104(1).

Third, even assuming a contract for sale existed between Campbell and the plaintiff, the conduct

of the clinical trial to test the safety of Ketek® was not a good, but a service.  That is, conducting

a clinical trial to test the safety of Ketek® is not a "thing[ ] . . . movable at the time of

identification to the contract for sale." ALA. CODE § 7-2-105(1).  Therefore, there is no

possibility that the plaintiff could establish a cause of action for breach of implied warranty of

merchantability against Campbell.

### Count Five: Fraud and Misrepresentation

Sanofi and PPD also argue that there is no possibility that the plaintiff can establish a

cause of action for fraudulent concealment (or fraud by omission) against Campbell.  (Doc. 15 at

15-18).  Before addressing this matter, the court must address the argument by Sanofi and PPD

that, pursuant to *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S. Ct. 1012, 148 L.

Ed. 2d 854 (2001), the plaintiff's fraud claim against Campbell is preempted by the Food, Drug

and Cosmetic Act ("FDCA").  (Doc. 1 at ¶ 30).  A strict reading of *Buckman* reveals that the rule

announced therein is applicable to "devices" approved by fraud-on-the-FDA.  At least one

17

member of this court, however, has extended the *Buckman* preemption doctrine to drugs approved by fraud-on-the-FDA.  *See Globetti v. Sandoz Pharmaceuticals Corp.*, 2:98-cv-0249-TMP, 2001 WL 419160 *1 (N.D. Ala. 2001); *Brasher v. Sandoz Pharmaceuticals Corp.*, 2:98-cv-2648-TMP & 2:98-cv-2650-TMP, 2001 U.S. Dist. Lexis 18364 *25 (N.D. Ala. 2001).

In *Buckman*, the Supreme Court stated:

> Policing fraud against federal agencies is hardly "a field which the States have traditionally occupied," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947), such as to warrant a presumption against finding federal pre-emption of a state-law cause of action.  To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.

*Buckman*, 531 U.S. at 347.  In *Brasher*, United States Magistrate Judge T. Michael Putnam stated:

> Although *Buckman* precludes a plaintiff from seeking damages because the defendant lied to the FDA, it is something completely different to contend that plaintiff is precluded from seeking damages for injuries due to lies to her.  Notwithstanding that information may have been misrepresented to or concealed from the FDA, once defendant undertook to misrepresent those facts *to plaintiff*, or to conceal *from plaintiff* facts it was bound to disclose, the plaintiff's claim no longer rests simply on the assertion that the agency was defrauded but on the additional fact that *she* was defrauded.

*Brasher*, 2001 U.S. Dist. Lexis 18364 at *27.

In *Brasher*, the defendant manufactured and marketed a drug called "Parlodel."  *Id*. at *5.  "Parlodel was approved by the Food and Drug Administration ("FDA") for prevention of physiological lactation ("PPL") from 1980 until January of 1995."  *Id*.  After receiving reports that Parlodel was causing seizures and strokes, the FDA repeatedly requested that the defendant include a more accurate warning of the danger posed by Parlodel in the package insert included

with the drug.  *Id*. at **7-14.  The defendant ignored the requests of the FDA and continued to market the drug with a package insert that under-reported the known instances of seizures and strokes.  *Id*.  The plaintiff's doctor, relying on the package insert provided by the defendant, prescribed Parlodel to the plaintiff who in turn suffered a stroke as a result of taking the drug.  *Id*. at **16-18, 39.  Judge Putnam correctly reasoned that because the defendant's misrepresentation was made directly to the plaintiff's prescribing physician, the Food, Drug, and Cosmetics Act did not pre-empt the plaintiff's fraud claim.  *Id*. at **25-30.

This case is dissimilar to *Brasher*.  Unlike *Brasher*, where the defendant made misrepresentations directly to the plaintiff's prescribing physician, defendant Campbell delivered false reports documenting her clinical trial work to PPD and Sanofi.  *Id*. at *13.  This difference is significant because the direct misrepresentation to the plaintiff's prescribing physician served as the basis for finding that the plaintiff's claim was not pre-empted in *Brasher*.  *Id*. at **25-30.  Without any direct misrepresentation from Campbell to the plaintiff in this case, the court finds that the plaintiff's fraud claim is pre-empted by the FDCA pursuant to *Buckman* and the reasoning in *Brasher*.  Because the plaintiff's fraud claim is preempted by federal law, the plaintiff cannot possibly establish a cause of action against Campbell for fraud.[7]

### Count Six: Wantonness

Lastly, Sanofi and PPD argue that there is no possibility that the plaintiff can establish a cause of action for wantonness against Campbell.  (Doc. 1 at ¶¶ 33-37; Doc. 15 at 8-9).  The Alabama Court of Civil Appeals has articulated the standard to be applied to claims of

---

[7]In view of the court's determination of this issue on preemption, it will pretermit any further discussion concerning the viability of any fraud claims.

wantonness:

> The Alabama Legislature has defined "wantonness" as "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others." § 6-11-20(b)(3), Ala. Code 1975. Wantonness involves the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result. The knowledge of the defendant is the *sine qua non* of wantonness. However, to prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff. Wantonness is a question of fact for a jury, unless there is a total lack of evidence from which the jury could reasonably infer wantonness.

*Clark v. Kindley*, 2050829, 2007 WL 431018, *3 (Ala. Civ. App. 2007) (internal citations omitted). The Alabama Supreme Court has also held that a duty of care owing is an additional element of that must be proved to establish a cause of action for wantonness:

> Before a plaintiff may recover against a defendant tortfeasor on theories of negligence or wantonness, the plaintiff must show that the law imposed on the defendant a duty, that that duty has been breached, and that the plaintiff has suffered an injury as a proximate result of the defendant's breach of the duty imposed by law.

*Tyler v. City of Enterprise*, 577 So. 2d 876, 877 (Ala. 1991). For the same reason that the court found that a duty of care does not exist for the purpose of the plaintiff's negligence claim, the court finds that a duty of care does not exist for purposes of the plaintiff's wantonness claim against Campbell. Therefore, the court finds that there is no possibility that the plaintiff can establish a cause of action for wantonness against Campbell.

## CONCLUSION

The court finds that there is no possibility that the plaintiff can establish a cause of action against defendant Campbell for the claims contained in the plaintiff's complaint. Therefore, the plaintiff's motion to remand is due to be denied. An appropriate order will be entered.

20

**DONE**, this 27th day of July, 2007.

**JOHN E. OTT**
United States Magistrate Judge